Argued and submitted January 31, reversed and remanded October 24, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KEYLAN FRANKLIN KNAPP,
*Defendant-Appellant.*

Washington County Circuit Court
C100016CR, C090068CR, C091133CR;
A145259 (Control), A145260, A145261

290 P3d 816

Ingrid A. MacFarlane, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

Defendant was found guilty of unlawful possession of methamphetamine in one case and had his probation revoked in two other cases based, in part, on having unlawfully possessed methamphetamine. Defendant asserts that the trial court in the possession case should have granted his motion to suppress the methamphetamine, and thus his conviction, as well as his probation revocations, should be reversed. For the reasons set forth below, we reverse and remand.

In reviewing a trial court's decision on a motion to suppress, we view the record, and all the inferences that it will support, in the light most favorable to the trial court's findings, if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). In this case, the only pertinent facts, derived from the testimony of the police officer who stopped the vehicle in which defendant was a passenger, are straightforward and uncontroverted.

Officer Mace of the Hillsboro Police Department observed a vehicle in which the brake lights were not functioning and the passenger's seat belt was not fastened. He initiated a traffic stop of the vehicle to investigate both traffic violations. He sought and received identification from Beardall, the driver, and defendant, the passenger. Defendant told Mace that he was on parole for armed robbery. Mace returned to his patrol car with identification from both Beardall and defendant, and he called in the information to dispatch. Mace also inquired as to whether he was required to tow the vehicle, given the problem with the brake lights. Dispatch informed him that the driver was on probation and that defendant had "a caution for Armed Robbery and some other things." For officer safety reasons, Mace requested backup before proceeding further with the traffic stop. Within a few minutes, Officer Hubbenette arrived. Mace received word that he did not need to tow the vehicle. Mace returned to the vehicle and asked Beardall for consent to search the vehicle, and Beardall consented. At Mace's request, Beardall and defendant got out of the vehicle and stood with Hubenette near the

patrol car while Mace searched the vehicle. Mace retained defendant's identification throughout that time. Mace found methamphetamine in the car near where defendant had been sitting and arrested defendant.

Defendant moved to suppress evidence of the methamphetamine found in the vehicle, arguing that he had been unconstitutionally detained and that the evidence was obtained as a result of that illegality. Or Const, Art I, § 9.[1] Defendant argued, and the trial court apparently agreed—as do we—that defendant initially was lawfully stopped for the seatbelt infraction, but that the stop of defendant became unlawful at the point when Mace ceased processing defendant's seatbelt infraction and instead asked Beardall to consent to a search of the car. *See generally State v. Leino*, 248 Or App 121, 124, 273 P3d 228 (2012) (Article I, section 9, is "not implicated if an inquiry unrelated to a traffic stop occurs during a routine stop but does not delay it, that is, if it occurs during an 'unavoidable lull' in the investigation"). In this case, Mace sought consent to search the car instead of proceeding with the traffic infraction, and he did not do so during an "unavoidable lull" in the traffic stop.

The state argued to the trial court, however, that the evidence was derived not from the stop of defendant, but as a result of Beardall's consent to the search of the vehicle. Moreover, the state asserted, defendant claimed no possessory or privacy right as to the vehicle. The court agreed with the state and noted that, to the extent that defendant implied that the traffic stop was unlawful as to Beardall as well as to himself, Beardall might have a good argument in favor of suppression given that it was his consent to the search of his car that led to the discovery of the disputed evidence, but defendant did not. The court therefore denied the motion to suppress, and defendant subsequently was convicted of possession of a controlled substance.

On appeal, defendant argues that the trial court reached the wrong conclusion. He notes that he was stopped for the seatbelt infraction, but further asserts that he was stopped in his capacity as a passenger in a vehicle in which

---

[1] Article I, section 9, of the Oregon Constitution provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

the driver had been stopped. For that proposition, he cites *State v. Presley*, 181 Or App 296, 300, 46 P3d 212 (2002) ("A stop of a driver is a stop of a passenger, and the limitations on the officer's authority therefore apply to passengers as well as to the driver."). He asserts that he was entitled to suppression based on the theory that evidence discovered during a consent search is inadmissible if the consent is the product of illegal police conduct, regardless of whether the defendant is the one who consented to the search, citing *State v. Ray*, 179 Or App 397, 40 P3d 528 (2002). The state rejoins that defendant may not seek suppression of evidence on the ground that the police discovered evidence as a result of a violation of another person's constitutional rights, citing *State v. Makuch/Riesterer*, 340 Or 658, 136 P3d 35 (2006), and *State v. Tanner*, 304 Or 312, 745 P2d 757 (1987).

Thus, the starting point of our analysis concerns the threshold question of whether we are to look solely to the stop of defendant, or whether we also look at the stop of the driver, in analyzing the Article I, section 9, issue. The cases on which defendant relies—*Presley*, *Ray*, and their predecessor, *State v. Dominguez-Martinez*, 321 Or 206, 895 P2d 306 (1995)—concerned whether a police officer exceeded the statutory authority granted by an earlier version of ORS 810.410—a version that has since been superseded— by seeking consent for a search during a traffic stop.[2] It is undisputed that there is no such statutory issue here: Defendant is asserting a violation of Article I, section 9, of the Oregon Constitution. More importantly, however, case law concerning situations in which a passenger in a stopped car seeks suppression on constitutional grounds makes it clear that those cases do not govern the analysis. Rather, in cases such as *State v. Lantzsch*, 244 Or App 330, 260 P3d 662 (2011), *State v. Courtney*, 242 Or App 321, 255 P3d 577, *rev den*, 351 Or 401 (2011), and *State v. Jones*, 241 Or App 597, 250 P3d 452 (2011), we analyzed whether a passenger had been unlawfully seized during the course of a traffic stop as a question separate from the stop of the driver.[3]

---

[2] "The foregoing interpretations of legislative intent [in *Dominguez-Martinez* and related cases] were superseded by the legislature in 1997." *State v. Rodgers/Kirkeby*, 347 Or 610, 620, 227 P3d 695 (2010).

[3] Defendant also asserts that *State v. Towai*, 234 Or App 292, 228 P3d 601 (2010), *rev den*, 349 Or 664 (2011), supports his contention that a passenger may

That premise does not, however, lead us to the conclusion that the state would have us draw—that defendant cannot pursue a constitutional argument under these circumstances because he had no protected possessory or privacy interest in the vehicle. In *Tanner*, on which the state relies, the defendant had entrusted stolen goods to the Bests, which were discovered when police searched the Best residence. 304 Or at 314. The defendant asserted that the stolen goods should be suppressed because the warrant was invalid. The state responded that, regardless of the validity of the warrant, the search did not violate the constitutional rights of the defendant. *Id.* The court concluded that "the entrustment of an effect to another is sufficient to establish a privacy interest that is violated when the effect is discovered through an unlawful search." *Id.* at 323. *Cf. Makuch/Riesterer*, 340 Or at 670 (Holding that the defendants had no possessory or privacy interests in their attorney's home as they did not own it, rent it or store possessions in it: "evidence may be suppressed only if police invaded the personal rights of the person who seeks suppression; the violation of someone else's rights is not enough.").

Unlike in *Makuch/Riesterer*, defendant here *has* established that his personal rights were invaded. That is, he has established that he was unlawfully detained at the point during the traffic stop when Mace ceased processing the citation and, instead, sought consent from Beardall to search the vehicle. *Leino*, 248 Or App at 124 (an officer may not inquire about unrelated matters as an alternative to going forward with processing a traffic infraction). At the time Mace asked Beardall for consent, Mace had heard back from dispatch and had all the information he needed to continue to process defendant's seat belt infraction or

challenge a search that was based on a driver's consent. *Towai*, however, stands for no such broad proposition. In that case, an officer approached a parked car with no suspicion of any crime or traffic offense. The officer subsequently searched the defendant's backpack—an act that constituted an unlawful seizure—and as a result of finding items in the defendant's backpack, subsequently sought the driver's consent to search the car. *Id.* at 294-95. There, "the state concede[d] that, if defendant had been unlawfully stopped, then the driver's consent to search the car was obtained through exploitation of that illegality." *Id.* Thus, in *Towai*, the analysis concerned the relationship between the illegality of the seizure of the defendant and the evidence sought to be suppressed; the analysis was not based on any notion that the defendant, by virtue of his role as passenger in a car, had the ability to raise issues concerning the validity of the driver's consent to a search.

release defendant. But, instead, Mace retained defendant's identification and asked Beardall for consent. The state does not argue that Mace's request for consent occurred during an unavoidable lull in the processing of defendant's seat belt violation or that Mace had any legitimate reason for not moving forward with that processing. *See, e.g., State v. Berry*, 232 Or App 612, 616-17, 222 P3d 758 (2009), *rev dismissed*, 348 Or 71 (2010) (the state has the burden of proving that an investigation of an unrelated criminal matter occurred during an unavoidable lull).

The question, then, is whether defendant is entitled to suppression of the disputed evidence based on *that* illegality—not on whether the police violated Beardall's constitutional rights by seeking consent to search his vehicle. That question must be analyzed within the framework set forth in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005). In *Hall*, the court addressed the question whether a violation of "a defendant's rights under Article I, section 9, may vitiate a defendant's subsequent consent to a search." *Id.* at 21. The court stated:

> "[A]fter a defendant establishes the existence of a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9, *see, e.g., [State v.] Johnson*, 335 Or [511, 522-26, 73 P3d 282 (2003)]* (discussing principle); (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9, *see, e.g., [State v.] Smith*, 327 Or [366, 379-80, 963 P2d 642 (1998)]* (discussing principle); or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence, *see, e.g., State v. Jones*, 248 Or 428, 433-34, 435 P2d 317 (1967) (discussing principle)."

*Id.* at 25.

Although *Hall* itself was decided in the context of a situation in which evidence was discovered after a defendant consented to a search, the courts have applied the *Hall* analysis in other situations involving a prior police illegality that were not followed by a defendant's consent to a search. That is, the *Hall* test is not limited to the facts under which *Hall* was decided. *See, e.g., State v. Thompkin*, 341 Or 368, 379-81, 143 P3d 530 (2006) (applying *Hall* where the defendant produced incriminating evidence in response to questioning following an unlawful stop); *Courtney*, 242 Or App at 333 (applying *Hall* analysis in context of discovery of evidence subsequent to an unlawful seizure where discovery was not based on the defendant's consent to search); *Towai*, 234 Or App at 297 (applying *Hall* analysis where evidence was discovered not as a direct result of the defendant's consent to search, but was obtained through exploitation of prior illegality); *State v. Washburn*, 216 Or App 261, 265-67, 173 P3d 156 (2007) (applying *Hall* where consent obtained from the defendant's father derived from prior illegal entry into the defendant's home).[4]

We thus turn to the question whether defendant has established a "minimum factual nexus" between the illegality—the unlawful extension of the stop of defendant—and the discovery of the evidence sought to be suppressed. A factual nexus requires a "but for" relationship between the unlawful police conduct and the evidence. To put it quite simplistically, had Mace been processing the traffic citation of defendant rather than unlawfully detaining defendant while seeking consent from Beardall to search the car, then the consent to search the car—and the discovery of the evidence—would not have occurred while defendant was being unlawfully detained. In a situation such as this—where the illegality is occurring at the same time and place as the gathering of the evidence and involves the same police officer—we have little difficulty discerning a "minimum factual nexus." *State v. Ayles*, 348 Or 622, 237 P3d 805 (2010), is exemplary. In *Ayles*, the defendant, a passenger in a vehicle lawfully stopped for a

---

[4] *But see State v. Vondehn*, 348 Or 462, 475-76, 236 P3d 691 (2010) (applying different test in the context of evaluation suppression with respect to evidence gathered after violation of *Miranda* rights).

traffic violation, was unlawfully stopped when an officer took and retained the defendant's identification. *Id.* at 625. The defendant subsequently consented to a search that ultimately resulted in the discovery of the evidence at issue. The state took the position that, under *Hall*, the defendant had not shown the requisite factual nexus between the illegality and the discovery of the drugs. In particular, the state asserted that the car had been stopped in a remote location and the defendant would not, as a practical matter, have left the scene had he not been unlawfully stopped, and that the officer would have sought the consent to search in any event. *Id.* at 630. After noting that the test for whether a factual nexus had been established was not based on the officer's intentions, the court further observed:

> "The second problem with the state's theory lies in its assertion that the only factual nexus that defendant has shown is that the unlawful police conduct *preceded* his consent. As noted, however, the illegal seizure did not simply precede the consent—it was *ongoing* at the time defendant gave his consent to the search; therefore, the two events were not just in close 'temporal proximity,' *Hall*, 339 Or at 35, but were occurring simultaneously."

*Id.* at 631 (emphasis in original); *see also Courtney*, 242 Or App at 338 ("[I]t will be the rare case where, although the evidence is discovered during an ongoing unlawful seizure, the satisfaction of the minimal factual nexus standard is not obvious.").[5]

In the present case, the state makes an argument that is substantially similar to the one the court rejected in *Ayles*. The state asserts that the unlawful extension of the stop of defendant "had no bearing on the officer's search of the driver's car. Indeed, the officer would have discovered the drugs and contraband regardless of" the violation of defendant's rights. The state goes on to posit that, had defendant been wearing his seatbelt, or indeed had defendant not been in the vehicle at all, "[t]he evidence would have been discovered in precisely the same manner." That, however, is not an argument that,

---

[5] In *Courtney*, we concluded that, although a passenger in a vehicle lawfully stopped for a traffic infraction was unlawfully seized when an officer directed him out of the vehicle, no factual nexus was shown between the unlawful seizure and the discovery of drugs in the vehicle in the course of lawfully preparing the vehicle to be towed. 242 Or App at 338.

as a matter of *fact*, there was no nexus between the unlawful detention and the discovery of the evidence. Rather, the state's argument is, in effect, that the evidence was admissible either under the "inevitable discovery" or the "independent source" doctrine. Those doctrines, as the court explained in *Hall*, are not used in evaluating whether there is a factual nexus between the illegality and the evidence, but rather come into play in determining whether the state has met its burden of showing "that the evidence did not derive from the preceding illegality." *Hall*, 339 Or at 25. The distinction is important because, while the defendant bears the burden of establishing the initial factual nexus, the state bears the burden of establishing the applicability of the inevitable discovery or independent source doctrines, or attenuation. *Id.*

Here, defendant has shown the requisite factual nexus between his unlawful detention—which occurred not simply at the same time and place as the discovery of the evidence, but occurred *because* the officer was seeking the evidence rather than proceeding with the traffic citation— and the discovery of the evidence he moved to suppress. Thus, the question becomes whether the state has shown that the discovery of the evidence was "independent of, or only tenuously related to, the unlawful police conduct." *Hall*, 339 Or at 35. That inquiry involves an evaluation of the circumstances, including the temporal proximity between the unlawful police conduct and the discovery of the evidence, the existence of intervening circumstances, or the presence of circumstances that mitigate the effect of the prior illegality. *Id.* The *Hall* court described several theories by which the state could meet its burden, either by showing that the evidence would inevitably have been discovered in the course of a lawful search, that the evidence derived from a source that was independent from the unlawful conduct toward the defendant, or that there is such a "tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence." *Id.*

As noted above, the state made arguments in the context of disputing the existence of a factual nexus that might be considered "inevitable discovery" or "independent source" arguments. We conclude that the state cannot rely on the

first of those theories, as it did not establish that the evidence inevitably would have been discovered in the course of a *lawful* search. *See Hall*, 339 Or at 25 (the focus is on whether the state "would have obtained the disputed evidence through *lawful* procedures" (emphasis added)). That is, although the state is correct, as noted above, that defendant may not base his constitutional claim on an alleged violation of another person's rights, the question at *this point* is whether the state has met its burden of showing that the evidence would inevitably have been discovered in the course of a lawful search. The state cannot do that, on these facts, without establishing that the search of the car was lawful. The state encounters a similar difficulty with respect to the "independent source" doctrine: As we noted in *State v. Backstrand*, 231 Or App 621, 628, 220 P3d 748 (2009), *rev allowed*, 350 Or 130 (2011), "[t]he 'independent source' exception to the exclusionary rule applies when the police did in fact acquire certain evidence by reliance upon an untainted source[.]'" (Quoting Wayne R. LaFave, 5 *Search and Seizure* § 11.4(a), 241 (3d ed 1996).) Moreover, aside from those difficulties, the state's arguments are based on its assertions about what Mace would have done that are not supported by evidence in the record. *See State v. Huggett*, 228 Or App 569, 577, 209 P3d 385 (2009) (rejecting similar argument by state where nothing in the record supported the "conjecture" about what an officer would have done had the illegality not occurred); *State v. Astorga*, 225 Or App 42, 50, 200 P3d 170 (2008), *rev den*, 346 Or 361 (2009) (state failed to establish that officer would have run warrant check even if the defendant had not been unlawfully stopped, nor did it establish that the evidence would have been discovered as a result of "proper and predictable police investigatory procedures").

Thus, the question reduces to whether the state has demonstrated attenuation. *State v. Lay*, 242 Or App 38, 252 P3d 850 (2011), provides guidance for evaluating the attenuation question, as it involved facts that are, in some ways, similar to those at issue here. In *Lay*, the defendant was a passenger in a vehicle lawfully stopped for a traffic infraction. The officer who stopped the vehicle asked both the driver and the defendant for their identification, ran a warrant check, then returned their identifications. *Id.* at 40.

The officer had observed signs that the driver was intoxicated and questioned her about drug use. She said that both she and the defendant had used methamphetamine earlier that evening, at which point the officer had reasonable suspicion to investigate drug offenses. *Id.* The officer then sought and received consent from the driver to search the vehicle. The officer found drugs in the vehicle and placed them on the hood, and the defendant "immediately and spontaneously stated that the drugs were his and did not belong to the driver." *Id.* at 41. That occurred "nearly 30 minutes after [the officer] initially took and ran defendant's identification." *Id.* at 41-42. In *Lay* (unlike in the present case), the defendant did not seek to suppress the drugs found in the vehicle. Rather, he asserted that his admission that the drugs belonged to him should be suppressed. *Id.* at 42.

As an initial matter, we concluded that the defendant had been unlawfully stopped when the officer took the defendant's identification and ran a warrant check. *Id.* at 45. As to the question whether the defendant was entitled to suppression of his admission, using the *Hall* methodology, we rejected the state's argument that there was no factual nexus between the unlawful detention of defendant and the admission because of the intervening lawful search of the vehicle pursuant to the driver's consent. We concluded, however, that the state had met its burden in establishing attenuation:

> "Here, defendant's initial statement that the drugs in the car were his occurred nearly 30 minutes after Powers obtained and ran defendant's driver's license, returned the license, and thanked defendant for his cooperation. Thus, the 'temporal proximity' between initiation of the stop and defendant's statement was not close. In addition, several 'intervening circumstances' serve to attenuate the stop from the statements. First, as discussed above, an intervening lawful stop occurred [based on reasonable suspicion that defendant possessed drugs]. Second, the drugs at issue were discovered as the result of an undisputedly lawful search based on the consent of the driver of the vehicle. That search was entirely independent of the unlawful stop—it was not based on any information acquired from the taking of defendant's identification and would have occurred even in the absence of the stop of defendant. Finally, we think it particularly significant that, without prompting

of any kind from the officers, defendant volunteered the statements which are the evidence at issue. *See State v. Ayles*, 220 Or App 606, 616, 188 P3d 378 (2008), *aff'd*, 348 Or 622, 237 P3d 805 (2010) (whether information is volunteered spontaneously, without police prompting, bears on attenuation from unlawful police conduct). Immediately after seeing the drugs that were discovered in the vehicle, defendant made the unsolicited statement that the drugs were his. The unsolicited nature of the statement, taken together with the other intervening circumstances, convinces us that the evidence at issue was sufficiently attenuated from the unlawful stop."

*Lay*, 242 Or App at 49. Thus, in *Lay*, we based our conclusion that there was attenuation on the following factors: The illegal detention had ended some 30 minutes before the evidence was discovered, and was followed by a lawful detention of the defendant based on reasonable suspicion; the evidence was discovered "as the result of an undisputedly lawful search based on the consent of the driver of the vehicle," *id.*, which was not based on any information acquired as a result of the illegality; the evidence was in the form of an unsolicited statement volunteered by the defendant. *See also State v. Phillips*, 232 Or App 547, 552-53, 222 P3d 738 (2009) (finding attenuation based on the defendant's "unprompted offer to allow [an officer] to search his vehicle"); *State v. Hawkins*, 225 Or App 355, 364-65, 201 P3d 239 (2009) (no attenuation where evidence was gained in the course of unlawful stop and no evidence was presented about whether the defendant's statements were volunteered or prompted by questioning).

Here, in contrast to *Lay*, the unlawful detention had not ended when the evidence was discovered. Moreover, although the evidence was discovered as a result of the consent of the driver of the vehicle, it was not "the result of an undisputedly lawful search." That is, although the state had the burden to demonstrate attenuation, it did not take the position that the search actually was lawful—it merely took the position that the search did not interfere with *defendant's* possessory or privacy interests. Finally, the evidence was not volunteered by defendant. All of those factors militate against a finding of attenuation. The only factor cited in *Lay* that is also present here is that the

discovery of the evidence was not based on any information gained as a result of the illegality; however, that factor is insufficient to establish that the evidence was not derived from a prior illegal police conduct. *See Hall*, 339 Or at 32 (rejecting claim that, in order for illegal police conduct to taint subsequently discovered evidence, the illegal conduct must have resulted in the discovery of information that led to further investigation); *Ayles*, 348 Or at 630-31 (same).

Under those circumstances, we conclude that the state has failed to meet its burden to establish attenuation. Accordingly, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.