## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ALAN SCOTT WYNNE,
*Defendant-Appellant.*

Yamhill County Circuit Court
CR100648; A149312

311 P3d 978

Peter Gartlan, Chief Defender, and Kyle Krohn, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and David B. Thompson, Senior Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

## SERCOMBE, J.

Defendant appeals a judgment of conviction for one count of unlawful possession of MDMA,[1] ORS 475.874, and assigns error to the trial court's denial of his motion to suppress evidence. Defendant was in the backseat of a police patrol car during the time that deputies searched—at his mother's invitation—the house where defendant and his mother lived. Defendant contends that, had he not been unlawfully seized by that confinement, he would have objected to, and inhibited, the entry and search of the house by the deputies. That search led to the evidence sought to be suppressed. We conclude that defendant failed to establish the existence of a causal connection—a minimal factual nexus—between the alleged unlawful seizure and the obtaining of the challenged evidence. For that reason, we affirm.

We review the trial court's denial of defendant's motion to suppress for errors of law, and we are bound by the trial court's findings of fact if there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We draw the facts, then, from the undisputed findings set out in the trial court's letter opinion and from the uncontested evidence presented at the hearing.

The Yamhill County Sheriff's Office received a call regarding a domestic disturbance between a mother and her son; the son, defendant, had left their residence on foot. Deputy Elder was dispatched. On her way to the house, Elder observed defendant walking down the road. She stopped and asked him what had happened. Defendant responded that his mother was angry because she had returned from out of town and found that defendant had broken things in the house. Defendant said that he had argued with his mother and then left. He further explained that a friend had agreed to pick him up, but the friend had driven by without stopping while defendant was talking to Elder, who was in uniform.

Defendant told Elder that he wanted to call his friend, but that he did not have a telephone or the friend's

---

[1] ORS 475.874 prohibits possession of "3,4-methylene dioxymethamphetamine," commonly known as "MDMA" or "ecstasy."

phone number; the number was on his mother's mobile phone, which was at the house. Elder, who was going to the house to check on defendant's mother, offered to give defendant a ride to the house to retrieve the phone number. Defendant accepted the offer, got into the backseat of the patrol car, and directed Elder to the house. By that point, another deputy, Stackpole, had joined Elder as a "backup" and followed her in his patrol car.

When they arrived at the house, defendant asked to stay in the patrol car because he did not want to be in the presence of his mother. Elder gave defendant permission to remain in the car, and she closed the rear door, which could not be opened from the inside.

When the deputies went to the door of the house, defendant's mother answered and invited the deputies inside. She immediately showed them how her house had been "trashed" when she was out of town. As the deputies went from room to room, they observed drug paraphernalia and other evidence of drug use, as well as damage to the property in the house. They specifically observed a baggie containing what appeared to be methamphetamine.

About 40 to 45 minutes after she had left defendant, Elder returned to the patrol car. Elder opened the rear door and gave defendant a *Miranda* warning, which defendant acknowledged that he understood. Elder told defendant that she and Stackpole had found drug paraphernalia and methamphetamine in the house. Before any questions were asked of him, defendant immediately responded that he did not have any methamphetamine in the house but only had other drugs. Elder then asked if defendant would show him where those drugs were, and defendant said that he would. Defendant took the deputies through the house, pointing out where his drugs were located and where he had conducted drug activity.

Elder then took defendant back to the patrol car, told him that he was under arrest, and handcuffed him. As Elder was driving defendant to jail, defendant stated, without any questioning from Elder, that he was glad that the

deputies had found only a small quantity of drugs because he usually had a larger amount of drugs with him.

Defendant moved to suppress the drugs found in the house and the statements that he made after those drugs were found, arguing that he had been unlawfully seized in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. Defendant specifically argued that he "was placed and locked in a patrol car, and he was under arrest at some point during that time he's locked in that car," but the deputies lacked probable cause to arrest him. Defendant claimed that, "because he [was] a resident of that house, he ha[d] a right to be asked to consent to a search if he was present" and that the deputies "[could not] take action to remove him from the house and, therefore, say he's not present prior to consent." Further, defendant argued that "[h]is consent, his cooperation did not come until after that unlawful conduct, and after the fruits of that unlawful conduct [were] revealed, and he was confronted with the fruits of that unlawful search." The state responded that defendant consented to riding in the patrol car to the house and to remaining in the car after arriving at the house and that defendant's mother gave consent to enter the house.

The trial court denied defendant's motion to suppress, concluding in part that "defendant was not improperly detained in the back of the police vehicle, but rather was there at his own request to avoid being in the presence of his mother. He was not prevented from being present while the officers went through the residence." The court determined that defendant's mother "consented to and personally took the two officers through her house to show them what had been done to her house and what was in her house" and that "[t]he items that were seized were in plain view and constituted evidence of an ongoing crime that was personally observed by the officers." The court further concluded that defendant voluntarily consented to an additional search of the home. Accordingly, the court ruled that the physical evidence discovered in the house, as well as defendant's pre-arrest and post-arrest statements, were lawfully obtained and admissible at trial. After that ruling, defendant entered

a conditional plea of no contest to the charge pursuant to ORS 135.335(3), and, in his written plea petition, reserved his right to appeal the denial of his motion to suppress.

On appeal, defendant again argues that Elder unlawfully seized him by leaving him locked in the car while she entered and searched the house. Defendant contends that he only agreed to remain in the car for the limited purpose of enabling Elder to obtain his friend's phone number and that Elder exceeded the scope of defendant's consent and unlawfully extended the seizure once she entered the house and conducted a search at the invitation of defendant's mother. According to defendant, it follows that the evidence from the house and defendant's statements should have been suppressed as the result of Elder's unlawful seizure of defendant. The state responds that any seizure of defendant was not unlawful because he consented to being in the patrol car for the entire time that he was there, and, alternatively, any extension of the seizure was supported by reasonable suspicion of criminal activity. The state further argues that, even if defendant was unlawfully seized, there was no causal connection—no minimal factual nexus—between that unlawful seizure and the deputies' discovery of the challenged evidence.

We need not decide whether defendant was unlawfully detained when the deputies left him in the patrol car while they searched the house. Even if we assume that defendant was unlawfully seized at some point when he was locked in the patrol car, we conclude that the evidence that defendant seeks to suppress did not result from any unlawful detention. *See State v. Hinds*, 225 Or App 470, 475, 202 P3d 187, *rev den*, 347 Or 43 (2009) (assuming, without deciding, that an unlawful stop occurred before concluding that suppression was not required).

The exclusionary rule under Article I, section 9,[2] operates to "restore a defendant to the same position as if

---

[2] We consider only whether suppression is required under Article I, section 9, because defendant does not separately develop any argument as to why the exclusionary rule under the Fourth Amendment requires suppression of the challenged evidence. *See, e.g.*, *State v. Kinkade*, 247 Or App 595, 599, 270 P3d 371 (2012) (declining to address Fourth Amendment claim where the defendant made "passing reference in his opening brief to the Fourth Amendment" but did not develop

'the government's officers had stayed within the law.'" *State v. Hall*, 339 Or 7, 24, 115 P3d 908 (2005) (quoting *State v. Davis*, 295 Or 227, 234, 666 P2d 802 (1983)). Under *Hall*'s governing framework, a defendant must first "establish[] the existence of a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct[.]" 339 Or at 25. Once a defendant establishes that relationship, the "state has the burden to prove that the [discovery of the evidence] was independent of, or only tenuously related to, the unlawful police conduct." *Id.* at 35. Here, defendant's argument for suppression fails at the first step; he cannot establish a minimal factual nexus between his detention in the back of the patrol car and the discovery of the drugs in the house.

Defendant claims that, if he had not been detained, he would have objected to the search of the home, and, in light of his status as a cotenant, the deputies could not have proceeded with the search over his objection. *See Georgia v. Randolph*, 547 US 103, 120, 126 S Ct 1515, 164 L Ed 2d 208 (2006) ("[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident."); *State v. Caster*, 236 Or App 214, 234 P3d 1087, *rev den*, 349 Or 479 (2010) (applying *Randolph* under the Fourth Amendment).[3] In response, the state does not challenge the legal rule that defendant sets out—that the deputies could not have lawfully proceeded with a search if

a "separate argument under the federal constitution"); *State v. Thompson*, 328 Or 248, 254 n 3, 971 P2d 879, *cert den*, 527 US 1042 (1999) (explaining that court would not address constitutional claims in the absence of "thorough and focused constitutional analysis").

[3] In analyzing third-party consent to search under Article I, section 9, the Oregon courts have not specifically adopted the bright-line rule announced in *Randolph*. *See State v. Kurokawa-Lasciak*, 249 Or App 435, 436, 278 P3d 38, *rev den*, 352 Or 378 (2012) (concluding that, under Article I, section 9, search of the defendant's van was unlawful because the defendant's companion lacked authority to consent to a search of the van). In a footnote, defendant argues that, "like the Fourth Amendment, Article I, section 9, precludes the state from using evidence discovered in a home against an objecting cotenant even when another cotenant consents to the search." We need not adopt that rule here because we otherwise conclude that defendant's causation argument finds no factual support in the record.

defendant had been physically present and had objected to the search—but instead argues that nothing in the record suggests that defendant's detention in the back of the police car prevented him from being present to refuse consent.

We emphasize the specificity of defendant's factual claim. Defendant does not argue that the deputies sought out his mother's consent because of something they learned as a result of his detention. *See State v. Washburn*, 216 Or App 261, 266, 173 P3d 156 (2007) (concluding that consent to search the defendant's home derived from a prior illegal entry into the home because police sought consent to enter a second time as a result of what they saw during the first unlawful entry); *State v. Towai*, 234 Or App 292, 297, 228 P3d 601 (2010), *rev den*, 349 Or 664 (2011) (agreeing with the state's concession that, if a deputy had not found glass cylinders during an unlawful search of the defendant's backpack, he would not have sought consent from the driver to search the car). Here, the deputies were responding to a domestic disturbance call at the home; their contact with defendant's mother would have occurred regardless of their contact with defendant or his presence in the back of the patrol car.

Defendant further acknowledges that his detention in the patrol car "admittedly lacks a direct connection to the *entry* into the house, which was authorized by the consent of defendant's mother." (Emphasis added.) In other words, the deputies' entry into the house was independent of defendant's detention. *Cf. State v. Courtney*, 242 Or App 321, 337-38, 255 P3d 577, *rev den*, 351 Or 401 (2011) (no factual nexus between discovery of methamphetamine pipes found during lawful search of vehicle—conducted while the car was being prepared for a "lawful tow"—and unlawful seizure of the defendant passenger).

To connect the discovery of drugs to his detention, then, defendant makes a very specific factual claim: "'But for' Elder unlawfully leaving him locked in the car beyond the scope of his consent to be seized, [he] would have objected to Elder's entry into the house." In other words, defendant claims that, had he not been held in the car, he

would have acted to effectively preclude the search of the home. As support, defendant points to his testimony at the hearing on the motion to suppress that, if the deputies had asked for his consent to search the house, he "would have asked for a warrant." That testimony only takes defendant so far, however, because defendant must also link his detention with his inability to object to the deputies' search. That is, defendant must point to some evidence in the record that supports one of two factual scenarios: (1) that, had he not been detained, defendant would have been at the house, and thereby been present to object when his mother invited the deputies to enter and tour the house; or (2) if the deputies had returned to the car with the phone number, they would have informed defendant of their intent to enter the house or otherwise requested defendant's consent to search.

Neither of those scenarios finds support in the record. As to the first, defendant specifically told Elder that he did not want to be in his mother's presence and wished to remain in the patrol car rather than go into the house. Defendant had earlier left the house on foot in order to avoid further argument with his mother, and defendant was near the house so that he could call his friend for a ride—that is, so that he could ultimately get away from the house and his mother. As to the second, defendant claims that, "[i]f Elder had respected the scope of defendant's consent and returned to the car before searching the house, defendant would have objected to the search of the house." Beyond that assertion, however, defendant does not explain why, at the point when the deputies returned with his friend's number, he would have spontaneously told them that he did not want them to search the house or why, at that point, the deputies would have asked defendant for his consent to search the house. On appeal, defendant at no point argues that, once defendant's mother invited the deputies inside the house, they had an obligation to go to the car to inform defendant of his mother's invitation to search.[4] Defendant cannot show

_____

[4] In the trial court, defendant argued in a written motion that

"[t]he question presented in [this] case is: when the co-tenant is present at the scene but unable to voice objection or consent due to being locked in a patrol car, whether the police have an affirmative duty to ask his consent prior to entry into the home and search thereof and seizure of items therein."

that his detention kept him from communicating his objection to the deputies' search of the house.

Accordingly, even if we assume that defendant was unlawfully seized, he did not establish a minimal factual nexus between that unlawful detention and the search of the house and discovery of the challenged evidence.[5] That is, the record does not show that defendant was placed "in a worse position than if the governmental officers had acted within the bounds of the law." *Hall*, 339 Or at 25. Accordingly, the trial court did not err in denying defendant's motion to suppress.

Affirmed.

---

On appeal, however, defendant does not advance any argument that the police had an "affirmative duty" to come out to the patrol car and request his consent to search.

[5] We do not separately address the other evidence that defendant sought to suppress—his statements and any additional evidence found in the house as a result of his consent to a second search of the home—because defendant's claims for suppression of that evidence are dependent on his argument that the deputies improperly seized evidence from the home during their initial search. *Cf. Courtney*, 242 Or App at 338 (after concluding that the defendant failed to establish factual nexus between his unlawful seizure and officer's discovery of methamphetamine pipes, court did not consider trial court's ruling on motion to suppress the defendant's later statements and evidence found as a result of the discovery of the pipes).